IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| VERLONDA HUFF, on behalf of ) | |
| JOSHUA L. HUFF ) | |
| ) | |
| v. ) | No. 3:12-0699 |
| ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To:   The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for supplemental security income, as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 14), to which defendant has responded (Docket Entry No. 18). Plaintiff has further filed a reply brief. (Docket Entry No. 19) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be GRANTED and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

---

[1] Referenced hereinafter by page number(s) following the abbreviation "R."

## I. Administrative History and Statement of the Facts

The following recitation is taken from plaintiff's brief, Docket Entry No. 15 at 1-6:

A. Course of Proceedings

Huff was born in 1990. (R. at 61.) With a filing month of November 1996, i.e., when Huff was six years old, Huff's mother Verlonda Huff,[2] applied on his behalf for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1382, 1382c, based on childhood disability. (R. at 22, 61.) In April 2007, the Social Security Administration determined at the initial level of administrative adjudication that Huff was disabled because his condition satisfied Listing 112.02. (R. at 22.) When a child on whose behalf SSI is received attains eighteen years of age, the Agency "redetermine[s]" whether the child continues to be disabled under the definition of "disability" for adults. 20 C.F.R. § 416.987 (2012).

In October 2008, Huff was found not disabled when his disability claim was redetermined under the adult "disability" standard. (R. at 28.) In February 2010, Huff was found not disabled under that standard on reconsideration. (R. at 31.) Huff then requested a de novo ALJ hearing. (R. at 40.) On May 24, 2011, Huff appeared with counsel and testified at an administrative hearing before ALJ Ronald E. Miller. (R. at 309-11.) In addition, Gary Sturgill, Ph.D., testified as a vocational expert. (R. at 58-59, 309-11, 316-20.)

On June 9, 2011, the ALJ followed the well-known five-step sequential evaluation to

---

[2]Verlonda Huff proceeds in this civil action on behalf of her son Joshua L Huff. For simplicity, Joshua L. Huff is referred to below as "the Plaintiff" or as "Huff."

decide that Huff was not disabled on and after October 2, 2008. (R. at 16-21.) . . . At step two, the ALJ determined that Huff had mild mental retardation as a "severe" impairment. (R. at 16.) 20 C.F.R. § 416.920(c) (2012) (step two). At step three, the ALJ concluded that Huff did not have an impairment or combination of impairments that met or equaled the requirements of a Listed impairment. (R. at 17.) 20 C.F.R. § 416.920(d) (2012) (step three). After step three but before step four, the ALJ made a residual functional capacity assessment, i.e., a determination of the most that Huff could do despite the total limiting effects of all his impairments. (R. at 18.) 20 C.F.R. § 416.920(a)(4) (2012) ("Before we go from step three to step four, we assess your residual functional capacity"); 20 C.F.R. § 416.945 (2012) (defining "residual functional capacity"). According to the ALJ, Huff retained the residual functional capacity to perform a "full range of work at all exertional levels performable by someone with an IQ in the 60s; that is, simple 1 to 2 step jobs." (R. at 18.) At step four, the ALJ determined that Huff did not have past relevant work. (R. at 19.) 20 C.F.R. § 416.920(f) (2012) (step four). The ALJ thus reached step five. (R. at 20.) 20 C.F.R. § 416.920(g) (2012) (step five). At step five, the ALJ relied on Grid Rule 204.00 as a "framework" with vocational expert testimony to decide that Huff was not disabled. (R. at 20-21.) 20 C.F.R. pt. 404, subpt. P, app. 2, § 204.00 (2012). According to the ALJ, Huff could perform three occupations in the specified incidences:

| Occupation | Tennessee | Nation |
| --- | --- | --- |
| housekeeper | 4,900 | 260,000 |
| builder cleaner | 2,600 | 142,000 |
| groundskeeper | 1,000 | 45,000 |

(R. at 20.)

On June 5, 2012, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Huff's request for review. (R. at 4.) 20 C.F.R. § 422.210(a) (2012). Huff then initiated this civil action. See 42 U.S.C. § 405(g); see also 42 U.S.C. § 1383(c)(3) (incorporating for SSI claims 42 U.S.C. § 405(g)).

B. Brief Statement of the Relevant Facts

1. Age

Huff was born in 1990. (R. at 61.)

2. Work Experience

Huff has not worked. (R. at 313.)

3. Education and Intelligence

In about April 1998, a school psychologist found, among other things, that Huff had adaptive deficits consistent with mental retardation. (R. at 133-35.) Huff's academic achievement was in the lowest percentile. (R. at 131.)

In December 2002, Agency examining psychologist Dr. Lane administered the Wechsler Intelligence Scale for Children (WISC-III) and found a Verbal IQ of 56, a Performance IQ of 59, and a Full Scale IQ of 53. (R. at 159.) He also administered the Wide Range Achievement Test 3 Revised, which showed that Huff read and performed math in the lowest percentile. (R. at 160.) Dr. Lane diagnosed moderate mental retardation. (R. at 161.)

In July 2008, Agency examining psychologist Dr. Foley administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) and found "reliable" test results, including a Verbal IQ of 68, a Performance IQ of 65, a Full Scale IQ of 64, a Working Memory of 64, and a Processing Speed of 61. (R. at 163-64.) The Wide Range Achievement Test-4 (WRAT-

4

4) showed:

| WRAT-IV Test | Grade Score | Standard Scores |
| --- | --- | --- |
| Word Reading | 1.4 | 55 |
| Sentence Comprehension | 1.4 | 55 |
| Math Computation | 2.9 | 63 |

(R. at 164.) In Dr. Foley's view, the "grade equivalents were below the level considered as functionally literate." (R. at 164.)

In July 2008, non-examining State-agency psychologist Dr. Edwards determined that Huff was mentally retarded with deficits in adaptive functioning and a valid verbal, performance, or full scale IQ of 60 through 70. (R. at 170.) In December 2008, non-examining State-agency psychologist Dr. Joslin agreed with Dr. Edwards. (R. at 191.)

Huff testified that he completed high school taking special education courses. (R. at 312; see also id. at 100.)

### 4. Other Medical Opinions About Mental Limitations

In July 2008, Dr. Foley opined:

> At the present time Mr. Huff will continue to need help managing his funds. He should be able to understand and remember simple age appropriate oral instructions. His concentration and persistence today were adequate. He would be able to maintain appropriate grooming. Although he possesses basic social skills he relates on a level much younger than his chronological age. He would age appropriately be aware of normal hazards and it is my opinion that he could be taught how to ride public transportation.

(R. at 164-65.)

In July 2008, Dr. Edwards opined that Huff was limited to "simple 1-2 step instructions; would have "difficulty" but could "sustain attention and concentration, keep to

a schedule, maintain attendance, and complete a work week;" could work with the general public "but will have difficulty," and could "deal with changes [in a] work setting and set realistic goals with difficulty." (R. at 182.) In December 2008, Dr. Joslin agreed with Dr. Edwards. (R. at 191.)

### 5. Evidence of Obesity

Huff is about five feet, three inches tall. (R. at 257, 272, 277.) The ALJ adjudicated the period since October 1, 2008. (R. at 21.) On October 31, 2008, Huff weighed 239 pounds. (R. at 196.) In 2009, 2010, and 2011, Huff weighed from about 245 to 250 pounds. (E.g., R. at 247 (248 lbs., 1/6/11); at 257 (251 lbs.,11/10/10 ); at 262 (254 lbs., 10/28/10); at 267 (249 lbs., 9/21/10); at 272 (250 lbs., 8/31/10); at 277 (253 lbs., 8/6/10); at 287 (254 lbs., 4/1/10); at 295 (250 lbs., 9/17/09); at 301 (245 lbs., 8/6/09).) Treating physician Dr. Lampkin diagnosed obesity. (E.g., R. at 245, 250, 275.)

### 6. Pulmonary Condition

Since October 1, 2008, treating physician Dr. Lampkin diagnosed asthma, including asthma with chronic obstructive lung disease (COPD). (E.g., R. at 245, 250, 255, 260, 283, 292, 302.) Dr. Lampkin prescribed medication for Huff's pulmonary condition. (E.g., R. at 248, 255, 275, 280, 285.) Dr. Lampkin characterized Huff's general appearance as "[c]hronically ill." (R. at 252, 257, 262, 267, 272, 277, 282, 287, 290, 295.)

### 7. Medical Opinions About Physical and Environmental Limitations

Dr. Lampkin opined that Huff had unspecified work restrictions. (R. at 254, 259, 264, 274, 279, 284, 292, 298.) He recommended that Huff avoid a factor that precipitated his pulmonary condition. (R. at 249, 254, 259, 264, 269, 274, 279, 284, 292, 298.) Dr. Lampkin also noted as part of Huff's Social History that Huff did not have a "physical disability." (R. at

246, 251, 256, 261, 266, 271, 276, 281, 286, 289, 295, 300.)

In August 2008, non-examining State-agency physician Dr. Warner determined that, due to his asthma, Huff needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (R. at 187, 190.) In December 2008, non-examining State-agency physician Dr. Ryan agreed with Dr. Warner. (R. at 192.)

## II. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

7

12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f). This sequential evaluation process is applied by the Administration to disability redeterminations at age 18, albeit without applying the first step regarding current engagement in substantial gainful activity. (R. 15 (citing 20 C.F.R. § 416.987(b))

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See

Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff first alleges error in the ALJ's determination at step three, where he found that plaintiff did not meet Listing 12.05(C), the adult mild mental retardation listing, because he did not have the combination of a qualifying IQ score and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." (R. 17) It is clear from the ALJ's opinion and from the record that plaintiff has a valid IQ score in the 60s,[3] with associated adaptive deficits and a childhood onset sufficient

---

[3]Consultative psychological examiner Thelma Foley, Ed.D., conducted intelligence and achievement testing on July 2, 2008, and diagnosed mild mental retardation. (R. 163-64) The ALJ gave great weight to Dr. Foley's assessment, noting its consistency with the evidence of record. (R.

9

to establish the diagnosis of mild mental retardation. Such an intellectual impairment, combined with any other significant impairment of function, would require an award of benefits. Plaintiff contends that his additional impairment of asthma, alone or in combination with his diagnosed obesity, imposes an additional and significant work-related limitation of function and thus establishes his disability under Listing 12.05(C). As both parties note, the analysis of this additional impairment for purposes of the Listing equates to the analysis of whether the impairment would qualify as "severe" at the second step of the sequential evaluation:

> For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

The ALJ addressed the severity of plaintiff's asthma at step two, finding as follows:

> The evidence reflects the claimant's asthma is well controlled with medications. There is no evidence to suggest the claimant has required emergency room visits or supplemental oxygen. Dr. Lampkin, the claimant's long time treating physician, indicated on numerous occasions that the claimant has no physical disability, is able to participate in normal activities of daily living, and approved for participation in school activities, physical education, and sports. Therefore, it is concluded asthma is not a severe

---

19)

10

impairment.

(R. 18) This is the only discussion of plaintiff's asthma and related symptoms or limitations that appears in the ALJ's decision. Plaintiff argues that this rationale misrepresents the degree of significance with which Dr. Lampkin regarded plaintiff's asthma, and that it fails entirely to account for the only physical residual functional capacity assessment in the record. (R. 183-90) In that assessment, nonexamining consultant Susan L. Warner, M.D., opined that plaintiff's asthma, though it did not limit his activities of daily living nor require any more intensive treatment than the typical prescription medications, required that he avoid "concentrated exposure" to fumes and dust in the workplace. (R. 187, 190) The thrust of plaintiff's argument is that this workplace limitation is "severe" rather than of minimal consequence to plaintiff's functional ability. However, while plaintiff points to treating physician Dr. Lampkin's notations that plaintiff should avoid precipitants of his asthma (Docket Entry No. 15 at 12 (citing R. 249, 254, 259, 264, 269, 274, 279, 284, 292, 298)), each of these notations follows Dr. Lampkin's assessment of plaintiff's "*mild* persistent asthma." (Emphasis supplied). Moreover, while plaintiff points in his reply brief to authority stating that an inability to be exposed to fumes and dust is more than a minimal limitation (Docket Entry No. 19 at 2), that is not the limitation that has been assessed in this case. Rather, plaintiff was assessed by Dr. Warner as being required to avoid only *concentrated* exposure to such irritants, not moderate exposure or any exposure at all. (R. 187)

The requirement of avoiding concentrated exposure to fumes and dust is not necessarily inconsistent with the ALJ's finding that plaintiff is no more than minimally limited by his asthma. It is clear that an impairment may impose limitations of work-related

function and yet be properly found "nonsevere." See SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim."). Moreover, it would seem that any degree of asthma would be incompatible with sustained exposure to environmental irritants.

Nonetheless, the ALJ did not acknowledge or discuss this uncontroverted assessment by Dr. Warner at any point in his decision. Nor did he discuss plaintiff's diagnosed obesity, and the extent to which it may complicate his asthma symptoms. He simply found that, "[i]n terms of the requirements in paragraph C [of Listing 12.05], they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." (R. 17) The ALJ thus appears to have implicitly rejected the restriction assigned by Dr. Warner, or neglected to mention it due to oversight or otherwise.

Curiously, in questioning the vocational expert at plaintiff's hearing, the ALJ raised the issue of environmental limitations by asking whether the jobs the expert identified as available to a mildly mentally retarded person would be eliminated by the requirement that the hypothetical worker avoid exposure to dust, fumes, and gases. (R. 319) When the expert answered in the affirmative, the ALJ asked if there were jobs that would accommodate "the asthma limitations plus simple two-step jobs, IQ in the 60s[.]" Id. The

expert identified three examples of clerical jobs that would be available with those resictions. Id. However, in his decision the ALJ did not rely on this testimony to the existence of clerical jobs, but only referred to the previously identified jobs of housekeeper, building cleaner, and grounds worker as examples of jobs available to a person limited by mild mental retardation. (R. 20) It appears, then, that the ALJ gave some consideration to the potential limiting effects of plaintiff's asthma, but deemed this condition nonsevere because it did not require him to avoid *all* exposure to workplace irritants, and because it did not impel Dr. Lampkin to recommend avoidance of any daily and school activities that he could otherwise tolerate.

In light of the low hurdle presented by the "severity" requirement incorporated into Listing 12.05(C); the assessment by a government consultant of a workplace restriction owing to plaintiff's asthma; the documentation in the medical record of plaintiff's significant obesity; and, critically, the fact that the ALJ did not acknowledge or discuss either the assessed restriction or the plaintiff's obesity, the undersigned concludes that the finding of nonsevere asthma, and thus of non-Listing level mental retardation, is not susceptible to review for substantial evidentiary support on the record as a whole. The ALJ simply failed to bridge the gap between the evidence and his finding of non-listing level mental retardation. See Simms v. Astrue, 599 F.Supp.2d 988, 1005 (N.D. Ind. 2009) ("Accordingly, the record indicates that the ALJ was aware of the environmental limitations, yet, she failed to address them or the conflicting opinions. Therefore, the ALJ failed to establish a logical bridge between her evidence and the RFC and remand is required.") (citing Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000)). Further administrative attention, and more explicit reasoning in light of the evidence, is due this issue at step three of the

13

sequential evaluation process.

Even if the Court were to find the ALJ's step three determination supported by substantial evidence, remand would still be in order, for consideration of the effect on plaintiff's RFC of his asthma and obesity limitations (if any), as well as consideration of the evidence of his functional illiteracy. As recognized at the outset of the ALJ's decision (R. 15), if the sequential evaluation proceeds past the third step, necessitating the determination of RFC, all work-related limitations must be considered, even those arising from nonsevere impairments. SSR 96-8p, 1996 WL 374184, at *5. Here, the ALJ elicited vocational expert testimony that a restriction against any exposure to dust and fumes would eliminate the housekeeper, building cleaner, and grounds worker jobs upon which the ALJ relied to carry his step five burden (R. 319), but did not determine how a restriction against only concentrated exposure to such irritants would effect such jobs. Although the ALJ presented another hypothetical which accounted for restrictions against any exposure to environmental irritants, and to which the expert responded by identifying available jobs which someone as intellectually limited as plaintiff could do, the "primarily clerical" jobs identified included office clerks, order fillers, and personal care attendants -- jobs which would appear to be reasonably likely to be affected to some extent if the evidence of plaintiff's functional illiteracy is credited.

Regarding that evidence of illiteracy, it is argued by defendant that the ALJ's finding of plaintiff's limitation to work "performable by someone with an IQ in the 60s" (R. 18) encompasses the first grade-equivalent reading level which Dr. Foley's testing revealed. While Dr. Foley did opine that the test scores revealing reading ability "below the level

14

considered as functionally literate . . . were in the range expected from Mr. Huff's IQ" (R. 164), it is not reasonable, in the undersigned's judgment, to consider the vocational factor of functional illiteracy subsumed within the hypothetical limitation to work capable of being performed by someone with an IQ in the 60s, especially considering that the expert had prefaced his testimony by allowing generally that the jobs he identified "are unskilled jobs and therefore deal with basic information and knowledge for persons having *limited* education." (R. 318 (emphasis supplied))

As plaintiff points out, his level of formal education does not fit neatly within the categories established by the regulations at 20 C.F.R. § 416.964(b). The lowest level of education recognized there is labeled "Illiteracy," which would indicate little to no formal schooling, while the "Marginal" and "Limited" designations span the grade levels which are expected to allow for simple, unskilled work, leaving "High school education and above" as the level of education indicating an ability to perform semi-skilled and skilled work. Id. While the ALJ found plaintiff to possess a "high school (12th grade special education diploma) education" (R. 20), he also found plaintiff limited to the performance of "simple 1 to 2 step jobs. (R. 18) It appears, however, that functional illiteracy would be a significant factor for consideration by a vocational expert in any case, and one that was not specifically presented in the ALJ's hypothetical questions in the case at bar. Although defendant argues that, "[b]ased on the disability report, plaintiff indicated that he could read and understand English . . . [and] could write more than his name in English," those boxes on the disability report form were checked by plaintiff's brother, Mr. Triston D. Caruthers, who completed the form for plaintiff. (R. 93, 102)

15

In short, even if the ALJ's step three finding were to be upheld, plaintiff's literacy and his degree of functional limitation resulting from asthma are issues which require reconsideration by the agency, as the undersigned finds a lack of substantial evidentiary support for the notion that the government has carried its step five burden on the current record. Accordingly, reversal of the ALJ's decision and remand for further administrative proceedings is recommended.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 15th day of January, 2015.


                                             s/ John S. Bryant
                                            JOHN S. BRYANT
                                            UNITED STATES MAGISTRATE JUDGE